Filed 2/27/13  Faris v. Cingular Wireless CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RAMSEY FARIS, | |
| Cross-complainant and Respondent, | G045602, G045895, G046131 |
| v. | (Super. Ct. No. 04CC12638) |
| CINGULAR WIRELESS LLC, | O P I N I O N |
| Cross-defendant and Appellant. | |

Appeals from a judgment and orders of the Superior Court of Orange County, Thierry Patrick Colaw, Judge.  Appeal Nos. G045602 and G045895 dismissed.  Appeal No. G046131 affirmed in part, reversed in part, and remanded.

Reed Smith, Margaret M. Grignon and Brandon W. Corbridge for Cross-defendant and Appellant.

Waldron & Bragg, Gary A. Waldron, Sherry S. Bragg; Duarte & Associates and James M. Duarte for Cross-complainant and Respondent.

\*          \*          \*

Respondent Ramsey Faris filed a cross-complaint against appellant Cingular Wireless LLC, now known as AT&T Mobility LLC (Cingular), for failing to defend him in the suit brought against him by The Consulting Group, Inc. (TCG) and Michael Flynn (collectively, plaintiffs) and to indemnify him. The trial court found in Faris's favor and awarded him damages, including attorney fees, costs, and expenses of his original attorney, James M. Duarte. The parties stipulated the court could determine the amount of attorney fees, costs, and expenses (further damages in this case) accrued by another of Faris's attorneys in a posttrial proceeding. The court filed what purported to be a judgment awarding Faris damages and stating Faris was entitled to recover the additional attorney fees, costs, and expenses, and left the amount to be awarded blank. Cingular filed a notice of appeal (No. G045602).

The court then heard the reserved issue and awarded Faris additional attorney fees, costs, and expenses as damages. Cingular filed another notice of appeal (No. G045895). The court then entered its final judgment and Cingular filed its third appeal (No. G046131).

We granted the parties' joint request to consolidate the appeals. Cingular contends, inter alia, the trial court erred in finding it breached a duty to defend and indemnify Faris, Faris failed to mitigate his damages, Faris was not entitled to be indemnified for his time spent in litigation, Duarte's interest charges were excessive as a matter of law, and the court was without jurisdiction to award Faris the attorney fees, costs, and expenses of his second attorney because the court had previously issued its judgment and Cingular appealed prior to that award. We affirm the judgment except with regard to the award of $65,743 to Faris for his own time and effort in connection with the lawsuit and reverse the award. We therefore remand the matter to the trial court to recalculate the prejudgment interest based on the reversal of the award for Faris's time and effort.

2

I

FACTS AND PROCEDURAL BACKGROUND

We set forth the facts consistent with the judgment. (*Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 522, fn. 3.)

A. *Faris's Brokerage Business*

Faris worked for a company that brokered the sale of businesses, V.R. Business Brokers. He started brokering the sale of small businesses for V.R. Business Brokers and then began brokering businesses on his own. Faris's company, The Faris Company, provided the brokerage services. Faris would find companies interested in selling, and then would look for buyers. He had one client, H.I.G. Group (H.I.G.). H.I.G. paid Faris a $1,000 a month retainer and was interested in purchasing architectural and engineering design companies.

Faris would go to the library and scan reference books looking for potential businesses to sell. He would then call the businesses and inquire whether the owner was interested in selling. If H.I.G. bought the business, H.I.G. would pay Faris a finder's fee based on the purchase price. Faris ran his company brokering the sale of businesses while he worked his other job at Bechtel as a regional site acquisition manager. He continued to run his brokerage business after being hired by Cingular.

B. *Faris's Work at Cingular*

Wanting to return to Southern California, Faris applied to Cingular for a job as a project manager in January 2002. As a project manager, he would manage the vendors doing the work: "a build plant for some cell sites." He had been informed Cingular was looking to replace an employee who left the company. He interviewed with Charlie Vranek and Mark Rivera of Cingular, believing he would be an employee if hired. Vranek was a vice-president at Cingular. Vranek and Rivera told Faris the former

3

employee left to work at TCG and they were looking to fill the position with an independent contractor.

On January 18, 2002, Cingular offered Faris a position as project manager in its real estate and network deployment department. Faris reported to Cingular for work at the beginning of February 2002, and was assigned a cubicle in its office housing over 100 employees, provided a computer mapped into Cingular's network, a desk, chair, and telephone. Cingular also provided Faris with a Cingular identification badge/key card and Cingular business cards stating Faris was a project manager. The business cards contained the Cingular address, telephone numbers, fax number, and a Cingular business e-mail address. Cingular also provided Faris with a cell phone. Faris was not free to work as and when he pleased; he was required to keep standard office hours. His work hours were "like everyone else in the office." He had to request vacation time off and it had to be approved before he could take time off. If he were going to be late or take a long lunch, he called his supervisor, Vranek.

Faris said Cingular was not sure how he was to be paid. Vranek suggested Faris could be brought in through a company owned by a former Cingular employee, Sandra Jacobs. Faris informed Vranek that Jacobs' company did not have health insurance, something he needed for his family. Varnek suggested Faris could be paid through another company, Manpower Professional Services, Inc. (Manpower). Faris filled out an application for Manpower, but does not recall ever meeting with anyone from Manpower. Manpower hired Faris and assigned him to work for Cingular as a project manager. Faris never reported to any supervisor at Manpower while working at Cingular.

Faris worked with a number of people at Cingular. He supervised people working in the field. Vranek decided what work Faris would perform and who he would work with. Vranek's office was a few yards from Faris's cubicle and Faris saw Vranek several times a day. During the first year, as Faris neared completion of the project on

4

which he was working, Vranek asked Faris to work with a new team and review invoices submitted by TCG, a vendor of Cingular's. Faris was told there was a "history of issues" with TCG's invoices and was asked to review the invoices to see if it "made sense" to pay them. Faris worked with a new team on the accounting project and reported to Elizabeth Martinez and Rivera. Martinez, the head of accounting, had overall responsibility for this project and Rivera had a working relationship with TCG for years. Faris continued to report to Vranek as well. Faris did not have project manager responsibilities while working on the audit.

This was completely different work than the job he had been performing as project manager, but Faris felt he had no choice because he needed the job. He checked TCG invoices from as far back as January or February 2001 because the invoices were in progress or were being questioned by Cingular. Before Faris sent any materials to TCG, the materials were reviewed by his supervisors. Faris was also asked to review TCG's proposal to do additional work for Cingular.

Another member of the team found duplicate billings after sifting through thousands of pages of billings. Faris developed a spreadsheet to track the billings. Because billings had been submitted on the project Faris had supervised, his knowledge of the project gave him the ability to substantiate whether certain bills were valid.

TCG representatives came to Cingular once a week during the audit period and Martinez reviewed the status of the invoices with them. Faris did not attend the meetings absent a request to attend. Cingular ultimately put a hold on TCG performing further work for it. In late 2002, Cingular decided it would not renew any contracts with TCG. Faris had no say in the decision and was not asked whether he felt Cingular should continue to use TCG as a vendor.

Vranek also asked Faris to work with Vic Allen from Cingular's Atlanta office and provide Allen with information about vendors, those who desired to be vendors, and those vendors Cingular would be interested in keeping. According to Faris,

5

Cingular wanted to formulate a single database containing its vendors to streamline contracts.

Faris continued to run his brokerage business on the side while working at Cingular. He used his personal fax, e-mail and equipment, not Cingular's, when he conducted any brokerage business. While working at Cingular, Faris arranged the sale of a candy company in Puerto Rico. He also contacted the owner of Delta Group Engineering (Delta) after finding information on the company at the library. Delta is located in Irvine and did site acquisition work and construction management. Faris asked Albert Teng, the owner of the Delta, if Teng was interested in selling. Teng replied that he was not actively looking to sell, but would be willing to listen to an offer. H.I.G. met with Teng but no sale was made.

Faris then took the information about Delta and placed a teaser, containing minimal information about the company, on the Merger Network on the Internet. If more information were revealed, a potential buyer could discover the name of the company and negotiate the sale directly with the company, depriving Faris of a finder's fee. Darin Anderson, the owner of Bridge Equity and a former officer of TCG, contacted Faris about the Delta teaser, but upon learning Delta was located in Southern California, Anderson withdrew due to a non-compete agreement. Faris did not know Anderson had been at TCG and did not learn of Anderson while working at Cingular.

The day after Anderson e-mailed Faris informing him of the non-compete agreement, Faris received an e-mail from Cingular stating Delta should be added to the list of companies Cingular would be interested in using as a vendor.

In March 2003, Faris terminated his working relationship with Cingular through Manpower. Faris's company then became a vendor for Cingular. At some point in time, Faris asked that his company be considered as a site development vendor for Cingular, a position TCG had held through the end of 2002. Faris's company received some work, but that ended when Allen found out about Faris's brokerage work.

6

C. *TCG's Lawsuit Against Cingular and the Indemnification Agreement*

TCG filed suit against Cingular in February 2003, for Cingular's alleged failure to pay for services rendered. Faris's deposition was taken on two occasions by TCG's attorney. Prior to the first deposition, Faris expressed concern about whether he was protected in the litigation. Al Jimenez, Cingular's in-house counsel, told Faris Cingular would provide him with an attorney. Faris prepared for the first deposition with Attorney Robert Cocchia, an attorney for Cingular. Cocchia told Faris he was Faris's "assigned attorney."

Faris was asked at the first deposition if he was represented by counsel. He said he was, and named Cocchia, who was present at the deposition, as his attorney. Cocchia did not correct Faris and at the conclusion of the day told Faris he had done fine. Cocchia did not advise Faris of any possible conflict of interest.

Prior to the second deposition, Faris spoke with Cocchia about having an agreement in place to protect himself. Faris e-mailed Cocchia a blank indemnity agreement he had received and asked if it was acceptable. Cocchia responded that he did not receive the attachment to the e-mail, but that it appeared the agreement was one Cingular was considering for third party vendors "who were threatened by TCG/Flynn," and he would look into the issue. Faris, who did not know what an indemnity agreement was prior to 2004, wanted one because Sandra Jacobs worked next to him at Cingular and she was being sued by Flynn, the owner of TCG. Faris was worried he could be next.

Cingular subsequently provided Faris with an indemnity agreement before the second deposition. Cingular and Faris entered into the agreement prepared by Cingular. Paragraph 2 of the indemnification agreement provides: "CINGULAR hereby agrees to indemnify, defend, and hold FARIS harmless from and against, and in respect to, *any and all claims*, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies, including interest, penalties and reasonable attorney fees, that FARIS may suffer or incur *which arise or result from any action* or claim brought by The

7

Consulting Group, Inc. (aka, 'TCG'), Michael Flynn, and/or any entity owned or controlled by Michael Flynn *as a result of FARIS's testimony* in The Consulting Group, Inc. v. Cingular Wireless, LLC, Case No. SACV 03-109 DOC (MLGX)."  (Italics added.)

Also before the second deposition, Cocchia asked Faris if he had a brokerage business.  Faris said he did.  Cocchia did not ask any follow-up questions about it, but told Faris the subject may come up during the second deposition.  Cocchia did not advise Faris how to respond if the subject came up during the deposition.  Cocchia did not express any concern about the matter and did not advise Faris to obtain independent counsel.

The second deposition was held on August 3, 2004.  Faris was questioned about the indemnity agreement by TCG's attorney.  TCG's counsel made a point of the fact that at the time Cingular terminated Faris's services, Faris was performing the same job TCG had previously performed and that Faris reviewed TCG's invoices to determine whether they should be rejected.  TCG's attorney asked Faris the name of the company Faris attempted to have Anderson buy.  Faris said it was Delta.  Faris denied he actively solicited Delta as a possible replacement company for TCG.

TCG and Cingular settled their lawsuit.  As part of the November 30, 2004 settlement agreement, and upon full payment of the negotiated consideration, TCG agreed to "release and discharge Cingular and its managers, officers, directors, shareholders, employees, independent contractors while acting on behalf of Cingular, . . . from any claims, demands, causes of action, . . . including losses and liabilities of whatever kind or nature . . . ."

D.  *TCG Sues Faris:  Faris's Cross-Complaint*

A month after the signing of the settlement in the TCG/Cingular lawsuit, TCG sued Faris, Anderson, a former CFO and treasurer of TCG, Charles O'Neal, a former part owner of TCG, and Brian Bloss.  The complaint alleged Faris conspired with

8

Anderson and O'Neal to "take business opportunities developed by TCG with Cingular and to use them for his own personal gain and to harm TCG's business relationship with Cingular." In furtherance of TCG's cause of action for intentional interference with contractual relations, the complaint alleged Faris worked as a business broker while working for Cingular, serving his own interest, and worked to intentionally damage TCG's relationship with Cingular.

Faris tendered his defense to Cingular and to Manpower. Cingular turned Faris down, as did Manpower initially. Manpower changed its mind and offered to defend Faris with a reservation of its right on the issue of indemnification with the added requirement that its counsel would take over Faris's defense. Faris rejected Manpower's offer to defend because Manpower's reservation of rights on the issue of indemnification would place Manpower in an adverse position, which would be exacerbated by the fact Manpower would be in control of Faris's defense. Duarte informed Manpower he could not permit Manpower to control Faris's defense while reserving its right on the issue of indemnification

In April 2005, Faris retained Attorney James M. Duarte to represent him, with an initial retainer of $1,000. The retainer set forth Duarte's hourly rate ($350) and informed Faris he would be responsible for payment of attorney fees as well as costs and expenses. Faris testified he understood Duarte's fees would be paid by a third party. Apparently to that end, a provision in the retainer agreement provided for a contingency fee agreement in the amount of 50 percent of any gross recovery from any action filed against any insurer. Almost two years later, Duarte increased his hourly rate to $500.

Duarte filed a cross-complaint in intervention against Manpower and Cingular, alleging breach of contract, breach of contract to defend, and seeking indemnity. He also filed an action against TCG.

In May 2009, TCG and Faris settled their lawsuit, agreeing judgment would be entered in favor of Faris. Flynn and TCG agreed to cooperate with Faris in his

9

prosecution of the action against Manpower and Cingular, with the understanding TCG and Flynn did not warrant that any information they supplied Faris would be beneficial to his cause of action. In exchange, Faris agreed to pay 15 percent of the gross amount received from Manpower and Cingular.

The stipulated judgment stated facts contradicting allegations TCG made in its three complaints and stated Faris's actions were in furtherance of his employment for Cingular. Almost two years later, Manpower settled with Faris, agreeing to pay him $655,000. TCG was paid $92,500 out of the settlement with Manpower.

E. *Trial, Stipulation, Statement of Decision, Judgment, and Appeals*

The cross-complaint against Cingular was tried to the court without a jury. On July 5, 2011, the court issued its statement of decision. The court found Faris had been an employee of Cingular, was sued for his conduct in the course and scope of his employment, and Cingular breached its duty to indemnify Faris under Labor Code section 2802. The court further found Cingular breached its duty to defend and indemnify Faris pursuant to its limited liabililty company bylaws and the indemnification agreement between Faris and Cingular. Additionally, the court found Faris incurred reimbursable damages and did not fail to mitigate his damages, but that Cingular failed to mitigate its damages.

The court awarded Faris just over $1.2 million in attorney fees, costs, and expenses related to his defense of the TCG lawsuit and $613,555.96 in attorney fees related to Faris's efforts to enforce his indemnity rights under Labor Code section 2802. It further awarded over $65,000 as compensation for time expended by Faris in the defense of the TCG lawsuit. The award for Faris's damages based on his time spent defending the TCG lawsuit was reduced by $25,000, a sum Faris received from the Manpower settlement.

10

Finally, the court found fees and costs incurred by Waldron & Bragg, the law firm that represented Faris at trial against Cingular, were incurred in an effort to obtain indemnification from Cingular, and accepted the parties' stipulation that the amount of the fees, costs, and expenses would be determined in a posttrial proceeding.

What purported to be a judgment reflected the amounts set forth in the statement of decision. The amount designated for the costs of suit, the attorney fees, costs and expenses accrued by Waldron & Bragg were left blank. Cingular filed a notice of appeal (No. G045602) prior to the hearing on the reserved issues.

At the hearing on attorney fees, costs, and expenses accrued by Waldron & Bragg, Cingular argued the court lacked jurisdiction to determine the amounts once it issued its judgment and a notice of appeal had been filed. Nonetheless, the court awarded Faris further attorney fees, costs, and expenses. The court found it had erred in awarding Cingular a $25,000 credit for the Manpower settlement. It found such a credit was duplicative because the court had also awarded Cingular a $655,000 credit for the Manpower settlement. Cingular then filed a second notice of appeal (No. G045893) purporting to be from an order after judgment affecting the substantial rights of the parties. (See Code Civ. Proc., § 904.1, subd. (a)(1).)

On November 3, 2011, the court amended and corrected the judgment reflecting elimination of the $25,000 credit to Cingular, and insertion of the attorney fees, costs, and expenses accrued by Waldron & Bragg, additional attorney fees accrued by Duarte in seeking indemnification from Cingular, and interest awarded Faris. Cingular then filed its third notice of appeal (No. G046131), this one being from the final judgment. We ordered all three appeals consolidated.

11

II

DISCUSSION

A. *Indemnity*

      1. *Labor Code Section 2802*

Labor Code section 2802 requires an employer to "indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful." (Lab. Code, § 2802, subd. (a).) Cingular argues the trial court erred in awarding Faris damages under Labor Code section 2802, contending Faris was sued for conduct outside the course and scope of his employment with Cingular. According to Cingular, Faris was sued for his side business's brokerage activities which were entirely separate from his work at Cingular. We review for substantial evidence the trial court's decision finding Faris suffered losses incurred in direct consequence of his discharge of his duties while working for Cingular. (*Markley v. Beagle* (1967) 66 Cal.2d 951, 962.) "'The gist of the "substantial evidence" rule is: [¶] "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . ." [Citations].'" (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429, fn. 5.)

TCG's complaint against O'Neal, Anderson, Brian Bloss, and Faris alleged a number of causes of action. Faris was not named in every cause of action. In those causes of action naming Faris as a defendant, including intentional interference with contractual relations, intentional interference with prospective advantage, and conspiracy, the complaint alleged Faris was an independent contractor with Cingular at all relevant times, he operated his brokerage business while working for Cingular, and during that

12

time "he wrongfully alleged to Cingular headquarters that TCG was too expensive and submitted fraudulent billings, all the while promoting Delta Engineering, a TCG competitor . . . ." TCG further alleged Faris's actions were performed in furtherance of his brokerage business, not in his capacity as a Cingular contractor or representative. According to the complaint, Faris's communications to Cingular caused TCG to lose future opportunities. We note it would seem TCG thought it necessary to characterize Faris's conduct as arising from his brokerage business given that under the settlement between TCG and Cingular, TCG agreed to "release and discharge Cingular and its managers, officers, directors, shareholders, employees, *independent contractors while acting on behalf of Cingular* . . . from any claims, demands, causes of action, . . . including losses and liabilities of whatever kind or nature . . . ." (Italics added.)

Substantial evidence supports the trial court finding "Faris was required to defend himself against the allegations raised by TCG because of acts that Faris performed within the course and scope of his employment with Cingular, i.e., the audit of TCG's invoices, the analysis of TCG's proposed new contract, and the interaction with Michael Flynn, all of which Cingular expressly tasked Faris to do." As the trial court found, Faris was assigned the job of reviewing TCG's invoices. All of Faris's contact with TCG and Flynn occurred because he worked as a project manager for Cingular and was assigned to the audit. Although the complaint alleged Faris was acting as a broker and for his own benefit, the *act* TCG deemed actionable was Faris's representation to Cingular that TCG was too expensive and had submitted fraudulent billings. Additionally, "[t]he allegations of the complaint are not determinative of whether the employee is deemed to be in the scope of his or her employment." (*Nicholas Laboratories, LLC v. Chen* (2011) 199 Cal.App.4th 1240, 1248, fn.2.)

Whatever Faris's intent in providing Cingular the information it requested, his representations were made in the course and scope of his work for Cingular. Cingular assigned him to the audit. It sought his input on TCG's billings as part of his

13

employment. Faris gave Cingular what it wanted — his input on TCG's billings — and was sued because of it. This substantial evidence supports the trial court's finding.

TCG and Flynn settled their lawsuit against Faris, agreeing judgment would be entered in Faris's favor. The judgment stated that after making the allegations alleged in the latest amended complaint, additional allegations arose, including the fact that Cingular assigned Faris to an audit of TCG's billings to Cingular, Cingular instructed Faris to review TCG's proposed new contract, to advise Cingular, and Faris had contact with TCG and Flynn in Faris's employment by Cingular as a project manager. The stipulated judgment further provides: "Most of the acts alleged by TCG against Faris are acts that he allegedly undertook or committed between February and October 2002, while acting within the course and scope of his employment for Cingular. TCG acknowledges that one of the reasons that Faris was named as a Defendant in this action was Faris's testimony in the TCG v. Cingular action." Finally TCG acknowledged it uncovered evidence during the action which led it to conclude Faris was acting in the scope and course of his employment at all time relevant to the action.

Cingular contends the stipulated judgment between TCG and Faris was the result of collusion and should not have been admitted into evidence. The trial court rejected the same argument and admitted the stipulated judgment into evidence, finding the stipulated judgment was "reasonable and valid, and should be given its full evidentiary effect." A trial court has wide discretion in admitting evidence and we will not disturb its ruling on appeal absent a clear abuse of discretion. (*People v. Johnson* (1974) 39 Cal.App.3d 749, 762.)

In an analogous situation, when an insured is sued and the insurance company rejects the tender of the defense, the insured is "free to negotiate the best possible settlement consistent with his or her interests, including a stipulated judgment accompanied by a covenant not to execute. Such a settlement will raise an evidentiary presumption in favor of the insured (or the insured's assignee) with respect to the

14

existence and amount of the insured's liability. The effect of such presumption is to shift the burden of proof to the insurer to prove that the settlement was unreasonable or the product of fraud or collusion. If the insurer is unable to meet that burden of proof then the stipulated judgment will be binding on the insurer and the policy provision proscribing a direct action against an insurer except upon a judgment against the insured after an 'actual trial' will not bar enforcement of the judgment." (*Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500, 509.)

Cingular has not demonstrated an abuse of discretion. Although Cingular alleged the stipulated judgment between TCG and Faris was the result of collusion, as the trial court recognized, there was no proof in support of the allegation. Although Cingular contends the stipulated judgment was "collusive as a matter of law," it did not set forth any facts precluding a determination the stipulated judgment was reached in good faith. Again, although TCG's complaints alleged Faris was acting outside the scope and course of his employment with Cingular, it was Faris's act of providing Cingular with his analysis of TCG's billings — the very task Faris was charged with performing by Cingular — that TCG deemed actionable. Faris was irrefutably acting within the scope and course of his employment with Cingular when he gave Cingular his analysis of the material he was tasked with reviewing.

Cingular's reliance on *Peter Culley & Associates v. Superior Court* (1992) 10 Cal.App.4th 1484, is misplaced. The present matter does not fit within *Culley*'s unique facts and there is no evidence the stipulated judgment between TCG and Faris was reached through collusion. TCG and Faris did not stipulate to a large settlement in TCG's favor, a settlement Cingular would have to pay to TCG if Faris established Cingular was obligated to indemnify him. Instead, judgment was found in Faris's favor. The trial court did not err in considering the stipulated judgment.

Neither did the court use a strict liability test in finding Faris was sued for work performed in the scope and course of his employment with Cingular. "'In

15

determining whether for purposes of indemnification an employee's acts were performed within the course and scope of employment, the courts have looked to the doctrine of respondeat superior.  [Citations.]  [¶] Under that doctrine, an employer is vicariously liable for risks broadly incidental to the enterprise undertaken by the employer—that is, for an employee's conduct that, in the context of the employer's enterprise, is "not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.  [Citations.]"  [Citations.]'  [Citations.]  An employee's conduct may fall within the scope of his or her employment 'even though the act does not benefit the employer, even though the act is willful or malicious, and even though the act may violate the employer's direct orders or policies.'  [Citation.]" (*Cassady v. Morgan, Lewis & Bockius LLP* (2006) 145 Cal.App.4th 220, 231.)

Although Faris's brokerage business was not for Cingular's benefit and the TCG's complaints alleged Faris was acting out of his own self-interest, the conduct that allegedly damaged TCG occurred when Faris gave Cingular his analysis of TCG's billings, the task Cingular had Faris perform for its benefit.  Based on the record before us the trial court did not err in concluding Faris did not deviate from his employment duty, much less *substantially* deviate from that duty, in providing Cingular with his analysis of TCG's billings.  (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1004-1005.)

2.  *The Indemnity Agreement*

Prior to TCG taking Faris's deposition a second time, Faris requested and obtained an indemnity agreement from Cingular.  Pursuant to the agreement, Cingular agreed "to indemnify, defend, and hold FARIS harmless from and against, and in respect to, any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies, including interest, penalties and reasonable attorney fees, that FARIS may suffer or incur which arise or result from any action or claim brought by The

16

Consulting Group, Inc. (aka, 'TCG') . . . *as a result of FARIS's testimony* in The Consulting Group, Inc. v. Cingular Wireless, LLC, Case No. SACV 03-109 DOC (MLGX)." (Italics added.) "Where, as here, the parties have expressly contracted with respect to the duty to indemnify, the extent of that duty must be determined from the contract and not by reliance on the independent doctrine of equitable indemnity. [Citation.]" (*Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 628.)

Cingular agreed to defend Faris in any lawsuit brought by TCG or Flynn as a result of Faris's testimony in TCG's lawsuit against Cingular. According to Cingular, it was only required to indemnify Faris for a lawsuit brought by TCG or Flynn based on Faris's "act of providing 'testimony.'" We do not accept Cingular's stilted interpretation of the agreement. Faris approached Cingular to obtain protection from a possible lawsuit by TCG or Flynn prior to testifying a second time in a deposition. There is no reason to believe Cingular's response was to offer to defend Faris *only against a lawsuit based on protected activity*, i.e., the mere act of testifying. (See Civ. Code, § 47, subds. (a), (b).) Faris sought real protection from Cingular. He did not intend Cingular would defend him only if TCG were to sue him on a ground that could not survive a demurrer.

The agreement was to defend and indemnify Faris in any lawsuit by TCG or Flynn resulting from Faris's testimony. TCG discovered during Faris's testimony that he had attempted to broker the sale of Delta. TCG then used this information to create a cause of action against Faris it would not otherwise have had. In such a case, the resulting lawsuit may be fairly said to have resulted from Faris's testimony. Having found Cingular was required to defend and indemnify Faris for his necessary expenditures and losses incurred in the discharge of his duties to Cingular (Lab. Code, § 2802, subd. (a)) and Cingular was obligated to defend and indemnify Faris pursuant to their indemnity agreement, there is no need to determine whether Cingular also had the duty to defend or indemnify Faris under its limited liability company bylaws.

17

B. *Mitigation of Damages*

Faris tendered his defense to Cingular and to Manpower. Cingular turned Faris down, as did Manpower initially. Manpower then stated its intent to defend Faris with a reservation of its right on the issue of indemnification and to retain its own counsel to take over Faris's defense. Faris cited Labor Code section 2802, its indemnification requirement, and refused Manpower's offer, keeping his retained counsel to defend the TCG lawsuit. Cingular now maintains Faris was obligated to accept Manpower's offer due to his duty to mitigate damages and as a result, the judgment should be reduced to $20,480, the amount Faris owed his attorney, Duarte at the time Manpower offered to defend Faris.

Notwithstanding the fact that Faris obtained a $655,000 judgment on his cross-complaint against Manpower, which may itself speak to the merits of Cingular's mitigation argument, Manpower's acceptance of the duty to defend was conditional in two respects. First, Manpower reserved its right to contest indemnity and to withdraw from the defense. Second, it required Faris to turn control of the defense in the TCG lawsuit to Manpower's attorney. Faris was not, however, required to turn the defense over to Manpower. Civil Code section 2778, subdivision 4 provides: "The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity, *but the person indemnified has the right to conduct such defense*, if he so chooses[.]" (Italics added.) Because Faris had the right to conduct his defense in the TCG lawsuit filed against him (Civ. Code, § 2778, subd. 4) and wanted his attorney to conduct his defense, he was not required to accept Manpower's offer to defend on the condition its attorney would conduct any defense. Accordingly, we deny Cingular's request to reduce the judgment to $20,480.

18

C. *Compensation for Faris's Time Expended on the Litigation*

The trial court awarded Faris $65,743 for his time and effort spent in litigating this matter. The court found Faris's time to have been a reasonable, necessary expense and properly compensated pursuant to Labor Code section 2802. The court calculated this amount by multiplying the 438 hours Faris purportedly devoted to the defense of the lawsuit by TCG and in attempting to obtain indemnification by Faris's "customary" billing rate of $150. Cingular argues that just as those individuals who represent themselves are not entitled to attorney fees, Faris is not entitled to be compensated for his time in connection with the lawsuit.

Cingular contends there are three fatal problems with the court's conclusion Faris should be compensated for his time in litigating this matter. First, a party is not entitled to compensation for time devoted to litigation. Second, Faris did not testify to putting in 438 hours in litigating this matter. Rather, he testified he prepared exhibit 41 so he could be "compensated for something" and that the exhibit reflects the time he spent reviewing "documents and so forth." The exhibit, however, was not admitted into evidence. Third, there is no evidence $150 was Faris's customary billing rate. His rate working for Cingular was, at its highest, $120 an hour.

"The 'costs' of a civil action consist of the expenses of litigation, usually excluding attorney fees. Under the common law rule, parties to litigation must bear their own costs. The right to recover any of such costs is determined entirely by statute. 'It is axiomatic that the right to recover costs is purely statutory, and, in the absence of an authorizing statute, no costs can be recovered by either party.' [Citations.]" (*Davis v. KGO-T.V., Inc.* (1998) 17 Cal.4th 436, 439.) Labor Code section 2802 requires an employer to "indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." (Lab. Code, § 2802, subd. (a).) Included within the phrase *necessary expenditures or losses* are "all reasonable costs, including, but not limited to, attorney's fees incurred by

19

the employee enforcing the rights granted by this section." (Lab Code, § 2802, subd. (c).)

"Our primary task in interpreting [Labor Code section 2802] is to ascertain the Legislature's intent and to adopt an interpretation that best gives effect to that intent. [Citation.] We examine the entire substance of a statute and the scheme of law of which it is a part to determine its scope and purpose, construe its words in context and harmonize its various parts. [Citation.] We begin by examining the statutory language because that is the most reliable indicator of legislative intent. [Citation.]" (*Thornton v. California Unemployment Ins. Appeals Bd.* (2012) 204 Cal.App.4th 1403, 1413.)

Section 2802 makes no mention of compensating a party for his or her time devoted to litigating the indemnity matter. There is nothing in the language of section 2802, indicating the Legislature intended "necessary expenditures and losses" to include time the employee spends advising his or her attorney or otherwise taking part in the litigation. We will not read what would amount to a unique exception, and a drastic change in the law, into the statute absent some indication the Legislature intended such result.

Traditionally the time and effort a party spends litigating a matter is not compensated as costs or attorney fees. A case in point is *Trope v. Katz* (1995) 11 Cal.4th 274. There the issue was whether an attorney who was a prevailing party on a contract action could be awarded attorney fees to compensate him for the time he devoted to the lawsuit acting in persona propria. (*Id*. at pp. 279-280.) Civil Code section 1717 authorizes the court to award attorney fees on a contract action when the contract permits awarding the prevailing party attorney fees. (*Id*. at p. 280.) The court held an attorney who represents himself in a lawsuit cannot be said to "incur" or become liable for services he himself provided, a prerequisite an award of attorney fees. (*Ibid*.)

Although the present issue is one of costs, not attorney fees, *Trope v. Katz, supra*, 11 Cal.4th 274 is still relevant to the issue presented. In denying the in propria persona party/attorney attorney fees, the court observed nonattorney litigants are not

20

entitled to reimbursement for their time spent in litigating a case. "The time that a doctor, for example, spends litigating a case on his own behalf also has value, both to the doctor himself and to society generally, for that time could otherwise be spent treating the sick or pursuing medical research for the benefit of all; an architect's time could otherwise be spent designing or building houses; a painter's time could be spent creating works of art for future generations to enjoy. However, it is clear that when it enacted [Civil Code] section 1717 the Legislature did not intend to allow doctors, architects, painters, or any other nonattorneys to receive compensation for the valuable time *they* spend litigating a contract matter on their own behalf." (*Trope v. Katz*, *supra*, 11 Cal.4th at p. 285.)

The Legislature was aware of the Supreme Court's observations in *Trope v. Katz*, *supra*, 11 Cal.4th 274 when it enacted subdivision (c) of Labor Code section 2802 in 2000. (*In re W.B.* (2012) 55 Cal.4th 30, 57 ["the Legislature is presumed to know about existing case law when it enacts or amends a statute"]; see Stats. 2000, ch. 990, § 1.) There is nothing in the language "the term 'necessary expenditures or losses' shall include all reasonable costs, including, but not limited to, attorney's fees incurred by the employee enforcing the rights granted by this section" (Lab. Code, § 2802, subd. (c)) to lead us to believe the Legislature decided to make an abrupt change in the law and for the first time to compensate a party for the time he or she spent litigating. "[A] court is without the power to saddle on the vanquished party in such cases costs which are not thus strictly authorized." (*Naylor v. Adams* (1911) 15 Cal.App. 353, 356.)

Unlike attorney fees, where each party *ordinarily* is responsible for paying his or her own attorney's fees (*Trope v. Katz*, *supra*, 11 Cal.4th at p. 278), the Legislature has generally provided prevailing parties be awarded their costs as set forth in the Code of Civil Procedure. (See Code Civ. Proc., § 1021.) Indeed, section 1033.5 of the Code of Civil procedure sets forth a laundry list of items that may be compensated as costs. Although Code of Civil Procedure section 1033.5 states the items listed in subdivision (a) of that section are deemed costs for purposes of section 1032 of the same code, it is

21

useful in this instance as it provides a list of items the Legislature has classified as compensable costs in at least one context. The time a party devotes to pursuing the litigation is *not* included in this list. When the Legislature has enacted a statute expressly listing those items that may be considered costs and a list of items that cannot be considered costs absent an express provision of law, it is reasonable to assume that when and if the Legislature intends to expand the items that may be considered costs, it would do so expressly, rather than merely stating necessary expenditures or losses are "all reasonable costs, including, but not limited to, attorney's fees incurred by the employee enforcing the rights granted by this section." (Lab. Code, § 2802, subd. (c).)

We conclude Labor Code section 2802 does not authorize a trial court to award as costs, compensation to a party for the time the party spent in litigation. Accordingly, we find the trial court erred in awarding Faris $65,743 as costs for his time attending to the present litigation.

D. *Pretrial Interest*

The court awarded Faris $613, 555.96 in damages under Labor Code section 2802 for enforcing his indemnity rights, $325,818.42 in attorney fees accrued by Waldron & Bragg, additional attorney fees for Duarte in the amount of $57,154.24, and $8,493.25 in prejudgment interest. Subdivision (b) of Labor Code section 2802 requires all orders for reimbursement of necessary expenditures "carry interest at the same rate as judgments in civil actions. Interest shall accrue from the date on which the employee incurred the necessary expenditure or loss." The statutory interest rate is "10 percent per annum on the principal amount of a money judgment remaining unsatisfied." (Code Civil Proc., § 685.010, subd. (a).)

Cingular urges us to reduce the award of Duarte's attorney fees because Faris's retainer agreement with Duarte purported to set the interest at one percent a month. We presume the trial court's judgment is correct, we also indulge in all

22

intendments and presumptions in favor of correctness, and Cingular has the burden of providing an adequate record affirmatively proving error. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.) Cingular has not carried its burden here. The only references in the section of Cingular's opening brief dealing with the issue of interest, are to the retainer agreement between Attorney Duarte and Faris, wherein the interest amount is set at one percent a month, and Duarte's billing record admitted into evidence below. According to Duarte's billing, he accrued $2,430,636.60 in attorney fees and interest. The court, however, awarded Faris *substantially* less. Based on Cingular's limited citations to the record in connection with this issue, we cannot find the court committed legal error in its award.

As a practical matter, the trial court will have to reconsider its award of interest given we have found Faris was not entitled to reimbursement for his time and effort put into this litigation. Any interest awarded Faris based on his award of $65,743 will need to be omitted on remand.


E. *Jurisdictional Issues*

At trial, the parties stipulated the court could determine the attorney fees, costs, and expenses accrued by Waldron & Bragg in posttrial proceedings. However, prior to the court issuing its original judgment in this matter and the court determining Waldron & Bragg's fees, costs, and expenses, Cingular argued the court should determine the issue before it issues a judgment because it would not have jurisdiction to do so thereafter. Cingular maintains the trial court was without jurisdiction to determine and award Faris attorney fees, costs, and expenses accrued by Waldron & Bragg once the court issued its original judgment and Cingular filed its notice of appeal. We note that while a court retains jurisdiction to award costs, including attorney fees, after issuance of a judgment (Code Civ. Proc., § 1032; Cal. Rules of Court, rule 3.1700(a)), the award in this case was not pursuant to Code of Civil Procedure section 1032. The award was

23

made as part of Faris's damages under Labor Code section 2802, subdivision (c). "For purposes of this section, the term 'necessary expenditures or losses' shall include all reasonable costs, including, but not limited to, attorney's fees incurred by the employee enforcing the rights granted by this section." (Lab. Code, § 2802, subd. (c).)

In issuing its original judgment, the court expressly stated it "retains "jurisdiction over this case to address and resolve as a part of this proceeding the issues relating to the appropriate amount of additional attorneys' fees, costs, and expenses to be awarded [Faris], and award such fees, costs, and expenses in the amount of ____." The court also left blank the amount of "costs of suit" to be awarded Faris.

Rather than finding the trial court lacked jurisdiction to make these awards based on a conclusion there is but one final judgment and the filing of a notice of appeal deprived the court of jurisdiction to alter the judgment, we find the initial judgment was not a final judgment. "A judgment is the final determination of the rights of the parties in an action or proceeding." (Code Civ. Proc., § 577.) The terms contained in the initial judgment reserving jurisdiction to award costs and further attorney fees *as damages* demonstrates the court did not view the purported judgment as a final determination of the rights of the parties; issues remained to be decided.

"There is only one final judgment, the last or ultimate judgment that determines the rights of the parties." (7 Witkin, Cal. Procedure (5th ed. 2008) Judgment, § 7, p. 551.) In this case, the final judgment was entered on November 3, 2011, after the trial court resolved all the issues, including Waldron & Bragg's fees, costs, and expenses. Cingular's appeal from the first purported judgment did not deny the trial court jurisdiction to resolve the remaining issues because the appeal was premature. The appeal in No. G045602 taken from the initial judgment is thus dismissed.

The appeal in No. G045895 is dismissed as well. It purports to be taken from an order after judgment affecting the substantial rights of the parties (Code Civ. Proc., § 904.1, subd. (a)(2)), but as the initial judgment was not a final judgment, the

24

order setting the amount of attorney fees, expenses, and costs accrued by Waldron & Bragg as *damages* was not an order after an appealable judgment.  We have addressed the issues raised herein because Cingular's notice of appeal from the subsequent *final* judgment (No. G046131) was timely.

III

DISPOSITION

The appeals in Nos. G045602 and G045895 are dismissed.  In appeal No. G046131, the judgment provision awarding Faris $65,743 for his time and energy in litigating the underlying matter is reversed.  The matter is remanded to the superior court to recalculate the prejudgment interest award to the extent the award reflects consideration of the $65,743 award we reversed.  In all other respects the judgment is affirmed.  Faris is entitled to his costs on appeal.

MOORE, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

IKOLA, J.